IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LKQ CORPORATION and KEYSTONE AUTOMOTIVE INDUSTRIES, INC. | ) ) ) | |
| Plaintiff, | ) ) | No. 20 C 2753 |
| v. | ) ) | Magistrate Judge Jeffrey Cole |
| GENERAL MOTORS COMPANY, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the following reasons, the plaintiff's motion to compel GM to prepare and provide a witness for an additional Rule 30(b)(6) deposition [Dkt. #171] is granted in part and denied in part.

The attorneys in this case have struggled with discovery and simply have not been capable of following the directives of local Rule 37.2. Plaintiff alone has filed six discovery motions totaling about 540 pages of briefs and exhibits [Dkt. ##68, 99, 110, 101, 111, 112, 113, 114, 115, 116, 150, 151, 152,171, 172, 173], all in a case about car hoods and grilles that plaintiff once characterized as simple enough that it did not even have to comply with its obligation to perform an ESI search. It is very likely that the case *could* have been litigated in a much more simple and efficient fashion but the attorneys on both sides have chose more of a scorched earth strategy. That's a strategy that has become more and more common, for some reason. And so, here we are again.

One could not, without a trial and testimony from all the attorneys involved, get through to what has actually gone on amongst the lawyers in discovery in this case. Accusations are made, back and forth, on each side, through nearly 500 pages of filings. [Dkt. ## 171-173, 175-179, 182-185]. As is common in cases that have gone off the rails, each side has a diametrically opposed view of

which law firm is made up of heroes and which is made up of villains. All the court can do at this point, is make a decision within the extremely broad discretion it has, *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013), with a visceral feel regarding the history the attorneys are fighting about.

On October 21st, with just five weeks left in discovery, the plaintiff served its fifth Rule 30(b)(6) deposition notice, demanding that GM prepare a witness to testify about five dozen or so topics and subtopics in five business days. That might sound a bit unreasonable but describing it does not do it justice. Here is what the plaintiff expected GM's witness to prepare to cover in those five days, all with about a month left in discovery, which ought to have concluded on October 1st [Dkt. #153]:

> 1. GM's Second Supplemental Answers to Plaintiffs' First Set of Interrogatories (No. 5), including:
>
>> a. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 128 and the design claimed in U.S. Design Patent No. D812,532, including the nature of each change and the date of each change.
>>
>> b. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 130 and the design claimed in U.S. Design Patent No. D812,532, including the nature of each change and the date of each change.
>>
>> c. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 131 and the design claimed in U.S. Design Patent No. D812,532, including the nature of each change and the date of each change.
>>
>> d. The differences between the lower grille designs shown to consumers in Sheremet Dep. Ex. 135 and the design claimed in U.S. Design Patent No. D786,743, including the nature of each change and the date of each change.
>>
>> e. The differences between the lower grille designs shown to consumers in Sheremet Dep. Ex. 136 and the design claimed in U.S. Design Patent No. D786,743, including the nature of each change and the date of each change.
>>
>> f. The differences between the lower grille designs shown to consumers in Sheremet Dep. Ex. 137 and the design claimed in U.S. Design Patent No. D786,743, including the nature of each change and the date of each change.

g. The differences between the lower grille designs shown to consumers in Sheremet Dep. Ex. 138 and the design claimed in U.S. Design Patent No. D786,743, including the nature of each change and the date of each change.

h. The differences between the lower grille designs shown to consumers in Sheremet Dep. Ex. 139 and the design claimed in U.S. Design Patent No. D786,743, including the nature of each change and the date of each change.

I. What was shown in connection with the consumer clinic summary marked as Sheremet Dep. Ex. 141, and how, if at all, it differs from the design claimed in U.S. Design Patent No. D840.285, and if it does differ, the nature of each change and the date of each change.

j. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 142 and the design claimed in U.S. Design Patent No. D824,825, including the nature of each change and the date of each change.

k. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 143 and the design claimed in U.S. Design Patent No. D824,825, including the nature of each change and the date of each change.

l. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 146 and the design claimed in U.S. Design Patent No. D824,825, including the nature of each change and the date of each change.

m. The differences between the hood designs shown to consumers in Sheremet Dep. Ex. 148 and the design claimed in U.S. Design Patent No. D824,825, including the nature of each change and the date of each change.

n. The differences between the hood designs shown to consumers in Sheremet Dep. Exs. 128, 130, and 131, the reasons for those differences, and the timing of the changes giving rise to those differences.

o. The differences between the lower grille designs shown to consumers in Sheremet Dep. Exs. 135-139, the reasons for those differences, and the timing of the changes giving rise to those differences.

p. The differences between the hood designs shown to consumers in Sheremet Dep. Exs. 142, 143, 146, and 148, the reasons for those differences, and the timing of the changes giving rise to those differences.

2. With respect to each of D786,743; D840,285; D812,532; and D824,825; any and all differences between the designs claimed therein and the design the of production version of the GM parts that allegedly practice those patents.

3. With respect to the hood claimed by U.S. Design Patent No. D812,532:

a. The identity of any and all manufacturers or vendors who received or responded to ]an Request for Production ("RFP"), or Request for Quotation ("RFQ"), or other similar request to manufacture or bid on the hood claimed U.S. Design Patent No. D812,532, whether or not the vendor ultimately responded or was ultimately chosen to manufacture the part in question, including the name of any and all people at such

3

vendors to whom the RFP or RFQ to manufacture or bid on the hood claimed U.S. Design Patent No. D812,532 was sent or would ordinarily be sent in similar circumstances.

b. The identity of any and all manufacturers or vendors that submitted any sort of communication to GM that included pricing for the hood claimed U.S. Design Patent No. D812,532, including the name of any and all people at such vendors or manufacturers included in any such response or communication, the date of such response or communication, and the substance of any such response or communication.

c. The name of all GM employees, including but not limited to employees responsible for sourcing, involved in obtaining pricing or quotes related to the manufacture of the hood claimed by U.S. Design Patent No. D812,532.

d. The document retention policies applicable to RFPs/RFQs and requests for pricing for the manufacture of the hood claimed by U.S. Design Patent No. D812,532.

4. With respect to the hood claimed by U.S. Design Patent No. D824,825:

   a. The identity of any and all manufacturers or vendors who received or responded to an Request for Production ("RFP"), or Request for Quotation ("RFQ"), or other similar request to manufacture or bid on the hood claimed U.S. Design Patent No. D824,825, whether or not the vendor ultimately responded or was ultimately chosen to manufacture the part in question, including the name of any and all people at such vendors to whom the RFP or RFQ to manufacture or bid on the hood claimed U.S. Design Patent No. D824,825 was sent or would ordinarily be sent in similar circumstances.

   b. The identity of any and all manufacturers or vendors that submitted any sort of communication to GM that included pricing for the hood claimed U.S. Design Patent No. D824,825, including the name of any and all people at such vendors or manufacturers included in any such response or communication, the date of such response or communication, and the substance of any such response or communication.

   c. The name of all GM employees, including but not limited to employees responsible for sourcing, involved in obtaining pricing or quotes related to the manufacture of the hood claimed by U.S. Design Patent No. D824,825.

   d. The document retention policies applicable to RFPs/RFQs and requests for pricing for the manufacture of the hood claimed by U.S. Design Patent No. D824,825.

5. With respect to the lower grille claimed by U.S. Design Patent No. D786,743:

   a. The identity of any and all manufacturers or vendors who received or responded to an Request for Production ("RFP"), or Request for Quotation ("RFQ"), or other similar request to manufacture or bid on the hood claimed U.S. Design Patent No. D786,743, whether or not the vendor ultimately responded or was ultimately chosen to manufacture the part in question, including the name of any and all people at such

vendors to whom the RFP or RFQ to manufacture or bid on the lower grille claimed U.S. Design Patent No. D786,743 was sent or would ordinarily be sent in similar circumstances.

b. The identity of any and all manufacturers or vendors that submitted any sort of communication to GM that included pricing for the lower grille claimed U.S. Design Patent No. D786,743, including the name of any and all people at such vendors or manufacturers included in any such response or communication, the date of such response or communication, and the substance of any such response or communication.

c. The name of all GM employees, including but not limited to employees responsible for sourcing, involved in obtaining pricing or quotes related to the manufacture of the lower grille claimed by U.S. Design Patent No. D786,743.

d. The document retention policies applicable to RFPs/RFQs and requests for pricing for the manufacture of the lower grille claimed by U.S. Design Patent No. D786,743.

6. With respect to the grille bezel claimed by U.S. Design Patent No. D840,285:

a. The identity of any and all manufacturers or vendors who received or responded to an Request for Production ("RFP"), or Request for Quotation ("RFQ"), or other similar request to manufacture or bid on the hood claimed U.S. Design Patent No. D840,285, whether or not the vendor ultimately responded or was ultimately chosen to manufacture the part in question, including the name of any and all people at such vendors to whom the RFP or RFQ to manufacture or bid on the grille bezel claimed U.S. Design Patent No. D840,285 was sent or would ordinarily be sent in similar circumstances.

b. The identity of any and all manufacturers or vendors that submitted any sort of communication to GM that included pricing for the grille bezel claimed U.S. Design Patent No. D840,285, including the name of any and all people at such vendors or manufacturers included in any such response or communication, the date of such response or communication, and the substance of any such response or communication.

c. The name of all GM employees, including but not limited to employees responsible for sourcing, involved in obtaining pricing or quotes related to the manufacture of the grille bezel claimed by U.S. Design Patent No. D840,285.

d. The document retention policies applicable to RFPs/RFQs and requests for pricing for the manufacture of the grille bezel claimed by U.S. Design Patent No. D840,285.

7. GM's policies, procedures, and general practices regarding obtaining pricing or cost quotations for the manufacture of GM's vehicle parts, including specifically, hoods, lower grilles, and grille bezels for the vehicles at issue in the instant case, including but not limited to timing of such requests, why such requests are made, under what circumstances such requests are made, who makes such requests, where such requests are stored or maintained, where responses are stored, who is responsible for storing and/or maintaining such requests and responses.

8. Why GM does not have any documents regarding communications with its vendors for the GM parts in question other than GM-LKQ 181674-181768.

9. The destruction of any and all RFPs/RFQs or requests for bids or pricing for each of the parts allegedly covered by one of the GM patents-in-suit, including:

    a. When the documents were destroyed;

    b. Why the documents were destroyed;

    c. Who destroyed the documents;

    d. Who made the decision to destroy the documents;

    e. What document retention policy mandated destruction of the documents;

    f. What documents GM maintains to document when and what it destroys;

    g. The interplay between the litigation hold GM generated and disseminated herein and destruction of any such documents.

10. The destruction of any and all responses to any RFPs/RFQs or requests for bids or pricing for each of the parts covered by one of the GM patents-in-suit, including:

    a. When the documents were destroyed;

    b. Why the documents were destroyed;

    c. Who destroyed the documents;

    d. Who made the decision to destroy the documents;

    e. What document retention policy mandated destruction of the documents;

    f. What documents GM maintains to document when and what it destroys;

    g. The interplay between the litigation hold GM generated and disseminated herein and destruction of any such documents.

11. The type of communications exchanged between GM employees responsible for the sourcing team and vehicle the design teams regarding RFPs/RFQs and requests for pricing and/or bids and responses thereto, including the timing of such communications and the purposes of such communications.

12. Any and all communications between the design team for the 2018 Buick Regal and GM employees responsible for sourcing associated with the hood of the 2018 Buick Regal relating to the RFP/RFQ process and the results thereof.

13. Any and all communications between the design team for the 2017-19 Cadillac XT5 and GM employees responsible for sourcing associated with the lower grille of the 2017-19 Cadillac XT5 relating to the RFP/RFQ process and the results thereof.

14. Any and all communications between the design team for the 2019-20 Chevrolet Camaro and GM employees responsible for sourcing associated with the grille bezel of the 2019-20 Chevrolet Camaro relating to the RFP/RFQ process and the results thereof.

15. Any and all communications between the design team for the 2017-20 Chevrolet Trax and GM employees responsible for sourcing team associated with the hood of the 2017-20 Chevrolet Trax relating to the RFP/RFQ process and the results thereof.

]

16. Any interactions between GM employees responsible for sourcing team for any of the GM vehicles at issue in the instant case and Ahngela Caliguiri, Carrie Colombo, and Robert Gollehur.

17. GM's instructions to vendors regarding the retention period for NDAs signed by consumers, including why the retention period is 1 year and why it is not longer.

18. Why GM does not have a copy of the contract with Lacks regarding the manufacture of the lower grille for the Cadillac XT5 and the names of the GM employees most knowledgeable about this contract, including:

    a. Where it was stored.

    b. If it was destroyed, why and when and by whom.

    c. The relevant document retention policy covering contracts with vendors and/or manufacturers of GM vehicle parts.

19. Why GM does not have a copy of the contract with Norplas or Magna covering conduct prior to June 26, 2018, regarding the manufacture of the Camaro grille bezel and the names of the GM employees most knowledgeable about this contract, including:

    a. Where it was stored.

    b. If it was destroyed, why and when and by whom.

    c. The relevant document retention policy covering contracts with vendors and/or manufacturers of GM vehicle parts.

20. How GM's group or department responsible for sourcing is structured, what is its role, and how it interacts with design teams and vendors.

21. Why GM did not produce the complete RFP/RFQ referenced in GM-LKQ 181768 and GM-LKQ 181757-766, including where the rest of the RFP/RFQ is located, whether it was destroyed; if it was destroyed, why it was destroyed, when it was destroyed, who destroyed it, and what document retention policy was it destroyed pursuant to; and whether there are other RFPs/RFQs for the part referenced in GM-LKQ 181

22. Why GM did not produce any response to the partial RFP/RFQ produced as GM-LKQ 181768 and GM-LKQ 181757-766, including the location of any response or responses, the number of responses, whether the responses were destroyed, and if they were destroyed, why they were destroyed, when they were destroyed, who destroyed them, and what document retention policy they were destroyed pursuant to.

23. The content of the documents produced by GM at GM-LKQ 181674-181768.

[Dkt. #173-1, at Page 6-15/15]. That, it has to be said, is the Rule 30(b)(6) deposition equivalent of a laser light show. *See United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir.2011)("... so distracting as to disturb our vision and confound our analysis."). How long would this fifth deposition last? No one can say, but the plaintiff hoped it would "continu[e] from day to day until completed." [Dkt. #173-1, at Page 2/15]. It would seem this is the type of thing plaintiff had in mind to fill in the additional two months of discovery it requested and which, it would now seem, was improvidently granted. [Dkt. #153].

At first blush, what plaintiff is attempting to do here seems excessive and out of proportion with the needs of the case. Fed.R.Civ.P. 26(b)(1). But one must recall that it is not plaintiff's first Rule 30(b)(6) deposition, and GM has already testified on over one hundred topics. Generally speaking, "a corporation should not be confronted with a seemingly endless sequence of depositions which necessarily interfere with the capacity of its officers and employees to properly discharge their employment duties, and which impose substantial financial costs." *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000); Advisory Committee Notes to 1970 Amendments to Rule 30(b)(6). At a certain point, perhaps after the ninety-ninth attorney-drafted topic or around the 541st page in an attorney-written memorandum, the subject of car hoods becomes tedious.

Moreover, Fed.R.Civ.P. Rule 30(b)(1) requires giving reasonable notice of a deposition. "Obviously no fixed rule can be laid down because much will depend on the other circumstances of the particular case." 8A C.Wright, A.Miller & R.Marcus, Federal Practice & Procedure: Civil § 2111 (1994). The fourteen days Fed. R. Civ. P. 32(a)(5)(a) might be used as a guide. But, the determination of the reasonableness of the notice for a deposition is case-specific and fact-intensive. *Peterson v. Union Pacific R. Co.*, 2007 WL 2701268, at *2 (C.D.Ill. August 23, 2007). *Nieman v.*

*Grange Mut. Ins. Co.*, 2012 WL 5471949, at *2 (C.D. Ill. 2012). Based on the facts here, and all that has gone before in this case: multiple Rule 30(b)(6) depositions on scores of topics and discovery dispute after discovery dispute after discovery dispute, five days was insufficient notice to prepare a witness on over sixty topics. *Cf. Nieman v. Grange Mut. Ins. Co.*, 2012 WL 5471949, at *3 (C.D. Ill. 2012)("Seven business days is not reasonable notice to prepare a witness to testify on all of these [fourteen topics and thirteen sub-] topics."); *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 327 (N.D. Ill. 2005) (denying a motion to compel the deposition of defendant employees after plaintiff unilaterally noticed depositions with 10 business days' notice just over 2 weeks before the discovery cutoff); *Fernandez v. Penske Truck Leasing Co., L.P.*, 2013 WL 438669, at *1 (D. Nev. 2013)(holding that 11 days did not provide reasonable notice of deposition where plaintiff's case had been pending nearly a year and the depositions were noticed two weeks before the discovery cutoff). "The plaintiffs were keenly aware of all of these facts and of the competing demands imposed by the other discovery disputes that had been percolating for some period." *Sulfuric Acid*, 231 F.R.D. at 327.[1]

So, the five dozen topics at the end of discovery are clearly excessive, but they do beg the question: why did Plaintiff not address these matters in an earlier Rule 30(b)(6) deposition during the ample discovery time it had already enjoyed? According to Plaintiff, it did – at least as to Topics

---

[1] The court probably appeared to be naive in regard to what generally happens when a motion for an extension of a discovery deadline is granted in its order allowing an additional two months of discovery back on September 23, 2021 [Dkt. #153 ("This Date is FINAL, and THERE WILL BE NO FURTHER EXTENSIONS."). Quite obviously, a motion to compel a sixty-five- or seventy -topic deposition filed five weeks before a newly extended deadline means that another motion for an extension is in the offing. Attorneys tend to simply fill whatever vacuum of time judges give them and, once having done so, ask for more rather than planning ahead and working efficiently toward a deadline that, in nearly all instance, they have selected themselves.

9

1 and 2 – but GM wrongfully thwarted it. But that's a misrepresentation of Plaintiff's previous Rule 30(b)(6) topics. First, Plaintiff tells the court that "Topic 1, which comprises 16 subtopics, seeks merely the substance of what GM disclosed to consumers at the various consumer clinicals it conducted related to the vehicles in question." [Dkt. #172, at 3]. This is clearly false. Topic 1 asks in each subtopic for a comparison between what was disclosed at the clinicals and what was claimed in the patents, and ges far beyond merely what was disclosed at the clinicals. Plaintiff next complains that "GM should have provided the information sought by Topics 1 and 2 in response to Plaintiff's 1st Rule 30(b)(6) Deposition Notice . . . Plaintiff's 2nd Rule 30(b)(6) Deposition Notice, . . . which generally sought "the facts and circumstances surrounding each and every consumer study, survey, or clinic regarding the overall appearance, styling, or appeal of the [vehicles in question]." [Dkt. #172, at 4]. This is also false, as those previous topics – "facts and circumstances"– have nothing to do with any comparisons or differences between designs and production versions. So, the very premise for Plaintiff 'sixth and current discovery motion – and, apparently for its previous motion for an extension of time – is faulty. Parties should not complain of emergencies that are of their own making. *See Ultratech, Inc. v. Tamarack Scientific Co.*, 2005 WL 696979, *1 (N.D.Cal. March 17, 2005). Poor draftsmanship appears to be the root cause of plaintiff's consternation over Topics 1 and 2. The requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute. *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000). Plaintiff didn't do that here.

Beyond that, and more importantly, the comparisons plaintiff is looking for in topics 1 and 2 are more in the nature of expert opinion or legal conclusions than what is appropriate for a Rule

10

30(b)(6) deposition. They go far beyond topics like "the research, development, design and operation of any . . . product," *NXP B.V. v. Blackberry Ltd.*, 2013 WL 5913456, at *4 (M.D. Fla. 2013), and ask for comparisons that would be the province of an expert or one skilled in the art. "A party may properly resist a Rule 30(b)(6) deposition on grounds that the information sought is more appropriately discoverable through ... expert discovery." *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 2014 WL 5786492, at *4 (D. Mass. 2014)*; see also Baleja v. Northrop Grumman Space & Mission Sys. Corp. Salaried Pension Plan*, 2020 WL 6586310, at *8 (C.D. Cal. 2020)(disallowing expert witness-type questions in 30(b)(6) context); *Monster Energy Co. v. Integrated Supply Network, LLC*, 2021 WL 2986357, at *6 (C.D. Cal. 2021)(questions involving the type of work an expert would do are improper); *DarbeeVision, Inc. v. C&A Mktg., Inc.*, 2019 WL 2902697, at *7 (C.D. Cal. 2019) ("when the proposed deposition topics are complex and highly technical, or involve legal issues that require the assistance of an attorney, the interrogatory is the preferred device."); *3M Co. v. Kanbar*, 2007 WL 1794936, at *2 (N.D. Cal. 2007) (inquiries seeking "legal conclusions ... should not form the basis for 30(b)(6) deposition topics").

Accordingly, plaintiff's motion is denied as to Topics 1 and 2.

Things don't get any better after those first two topics. Topics 3-23, some of which include as many as nine subtopics, deal with what the parties refer to as "vendor documents." But here, as before five dozen or so topics and subtopics, at the end of already long and arduous discovery, are too much. Again, plaintiff could have, and ought to have gone about this is a simpler, more focused way. This kitchen sink approach to lawyering is burdensome both to an opponent and the court. And, it does not always paint the side engaging in it in a favorable light. *Compare Cole v. Comm'r*, 637 F.3d 767, 772 (7th Cir. 2011)("scattergun approach [that] generally does not serve [clients]

well,"); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000)("kitchen sink approach . . . [that] cause[s] distraction and confusion, . . . .").

That being said, this portion of the plaintiff's motion cannot be dismissed out of hand. GM was ordered to produce the so-called vendor documents back on September 10, 2021. [Dkt. #146]. GM claims that it has produced the documents in its possession after a search that included interviews, searching of electronic and paper files, and searching of archived files stored at Iron Mountain. According to GM, with respect to two of the four patents – the Chevy Trax hood and the Buick Regal hood – there simply were no relevant documents because, as GM confirmed, the parts were manufactured by GM, not a third-party, and no other third-parties were quoted. For the other two – the Cadillac XT5 lower grille and the Camaro grille bezel – GM produced the documents in its possession. That production apparently amounted to just four documents and a total of six pages relevant to the Cadillac XT5 lower grille manufactured by Lacks Trim Systems. GM claims it found no documents pertaining to the Camaro grille bezel manufactured by Norplas/Magna. [Dkt. #176, at 5-7].

That may be true, but why? A production of four documents is paltry. Testimony from at least on GM witness shows that it did have responsive documents, including, at a minimum, RFQs and RFQ responses it sent to Lacks and Magna/Norplas [Dkt. #181-3; Trans., at 219:25-220:3); Moreover, through third party discovery, plaintiff received one such document from Magna and others from Norplas demonstrating that the parts allegedly covered by the '285 patent-in-suit were disclosed as early as November 2015, and quoted to GM for production as early as January 2016, So the question – a valid one – is, obviously, what happened to these types of documents such that GM could only find four of them?

But, simply because a question is valid does not mean it merits five dozen topics. A number of the topics cast too broad a net if plaintiff is truly interested in why GM was able to locate just four responsive documents as to the products at issue in this case. Topic 7, for example, is ridiculously overbroad, seeking testimony on "GM's policies, procedures, and general practices regarding obtaining pricing or cost quotations for the manufacture of GM's vehicle parts, including specifically, hoods, lower grilles, and grille bezels for the vehicles at issue in the instant case, including but not limited to timing of such requests, why such requests are made, under what circumstances such requests are made, who makes such requests, where such requests are stored or maintained, where responses are stored, who is responsible for storing and/or maintaining such requests and responses." The topic is far too general and far too unfocused. Plaintiff makes no attempt to justify the topic *as written* in its reply brief, editing out the word "including" to suit its changing purposes. [Dkt. #182, at 12-13]. To the extent it is relevant to plaintiff's document retention agenda, it is out of proportion to the needs of this case. Similarly, Topics 11-16, written with sweeping lack of focus –"any and all communications"; "any interactions" – are overly broad and, to the extent they may be relevant, again, are out of proportion with the needs of this case. The same can be said of Topic 20, which goes far afield from what plaintiff claims to be interested in, asking for testimony on department structure.

That leaves Topics 3-6, 8-10, 17-19, 21-23. Subtopics "c" of Topics 3-6, seeking testimony on "all GM employees, including but not limited to employees responsible for sourcing, involved in obtaining pricing or quotes . . . ." fall into the foregoing category of being out of proportion to the needs of the case and only marginally relevant. But, GM will have to prepare a witness on the balance of Topics 3-6, and Topics 8-10, 17-19 and 21-23. It may well be that more than one witness

13

will be necessary – GM claims, without much explanation, that this will be the case. The court, perhaps naively, encourages the parties to meet and confer to work out the scheduling of this remaining fact discovery exercise in an effort to reduce the potential cost and waste. Fact discovery does close December 1, 2021. [Dkt.#153]. The court is willing to be flexible as to the date or dates of the Rule 30(b)(6) deposition falling beyond that time frame but there will be not be any further extension and no further fact discovery in the case. To underscore that point, while judges and magistrate judges all too frequently utter those words only to go back on them time and again, given the unfortunate history of discovery in this particular case, those words, in this instance, are final.

ENTERED:  /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/19/21

14